IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA      )
                              )
          v.                  )      1:03-CR-241-1
                              )      1:03-CR-242-1
BENNY LYNN ISOM               )

## MEMORANDUM ORDER

Before the court is *pro se* Defendant Benny Lynn Isom's motion
for compassionate release.  (Doc. 209.)[1]  The Government has
responded in opposition.  (Doc. 210.)  Isom has filed a reply.
(Doc. 212.)  For the reasons set forth below, Isom's motion for
compassionate release will be denied.

## I.    BACKGROUND

On April 18, 2002, Isom entered Fidelity Bank in Greensboro
to exchange some cash.  (Doc. 137 at ¶ 4.)  When his transaction
was completed, he inquired about cashing money orders.  (Id.)  The
bank teller informed him he needed an account to do so, and a
second teller interjected to say that Isom could cash the money
order at a post office.  (Id.)  At that time, Isom brandished a
handgun and pointed it at the tellers.  (Id. at ¶ 5.)

Isom demanded that the tellers give him a bank bag which
contained keys to the ATM.  (Id.)  Once he had the bag, Isom

---

[1] Isom has filed his motion for compassionate relief in both of his
criminal cases.  Unless otherwise noted, all references to the docket
herein are to case number 1:03-CR-241-1.

demanded that the tellers give him the money from their teller drawers. (Id.) As the tellers were collecting the money and while Isom pointed a gun at them, Isom stated "Don't look at me or I'll shoot you." (Id.) Once he had the money from the teller drawer, Isom directed the tellers, "Come on, let's go to the back." (Id. at ¶ 6.) Soon thereafter, Isom exited the bank with $12,640. (Id.) He remained at large.

On April 29, Isom and another individual entered the Central Carolina Bank in Asheboro, again asking the teller to exchange some cash. (Id. at ¶ 8.) Once the transaction was completed, the other individual brandished a handgun. (Id.) Isom then brandished his own handgun and handed a white plastic bag to the teller. (Id.) Isom's accomplice walked to the manager's office and ordered the manager and another employee to lie on the floor at gunpoint. (Id. at ¶ 9.) At that time, Isom ordered the teller to remove the cash from her teller drawer and place it in the white plastic bag. (Id.) Isom and his partner then moved behind the teller counter, at which point Isom ordered the teller to lie down. (Id. at ¶ 10.) Isom and his accomplice gained access to two additional drawers and exited the bank with $35,992. (Id.) Again, Isom was not apprehended following this robbery.

On June 21, armed with a firearm, Isom robbed a Sprint Cellular store in Greensboro. (Id. at ¶ 60.) Unlike the previous robberies, however, Isom was arrested by the Greensboro Police

Department.  (Id.)  During his arrest, Isom lied about his name and assaulted two of the arresting officers by striking them with his fists and biting one of the officers on the wrist.  (Id. at ¶ 61.)  At the time, Isom was also wanted on a March 5, 2002, warrant from South Carolina after a bank robbery suspect fled in a vehicle registered to Isom.  (Id. at ¶ 65.)

On July 1, 2003, a grand jury in this district returned two indictments against Isom, charging him with bank robbery and armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d), and with brandishing a firearm during and in relation to armed bank robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  (Doc. 1; 03-CR-242-1 Doc. 1.)  Following a consolidated three-day trial, a jury found Isom guilty on all counts.  (Doc. 51; 03-CR-242-1 Doc. 48.)  Isom was sentenced to concurrent career offender sentences of 275 months of imprisonment on each robbery, seven years of imprisonment on the § 924(c) count in 03-CR-241-1 to run consecutive, and 25 years of imprisonment on the § 924(c) count in 03-CR-242-1, also to run consecutive.  (Doc. 68; 03-CR-242-1 Doc. 65.)  In total, Isom was sentenced to 659 months in prison, or roughly 55 years.  The court also ordered restitution in the amount of $48,596.  (Doc. 68.)  The Fourth Circuit affirmed Isom's judgment and sentence.  United States v. Isom, 138 F. App'x 574 (4th Cir. 2005).  Isom thereafter filed various unsuccessful motions pursuant to 28 U.S.C. § 2255.  (Docs. 97, 117, 118, 140,

3

141, 145, 158, 163.)

Isom first moved for compassionate release on November 23, 2020. (Doc. 195.) However, the court denied that motion because Isom had failed to exhaust his administrative remedies. (Doc. 201.) On February 7, 2022, Isom filed the present motion seeking compassionate release.[2] (Doc. 209.) Isom is currently housed at USP McCreary with a release date (including credit for good conduct time) of May 30, 2051. See BOP Inmate Locater, https://www.bop.gov/inmateloc/ (last accessed Apr. 11, 2022). He is 65 years old and has served roughly 18 years of his 55-year sentence. (Id.; Doc. 210-1 at 1, 3.)

"Federal law has long authorized courts to reduce sentences of federal prisoners facing extraordinary health conditions," but prior to the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, district courts could grant such reductions only upon a motion by the Director of the Bureau of Prisons ("BOP") under 18 U.S.C. § 3582(c)(1). United States v. Beck, 425 F. Supp. 3d 573, 577-78 (M.D.N.C. 2019). However, Congress amended § 3582(c)(1) when it passed the First Step Act.

---

[2] The Government does not raise an exhaustion challenge to Isom's present motion. The § 3582(c) exhaustion requirement is non-jurisdictional, such that the Government can thereby waive, forfeit, or abandon its right to assert the defense of failure to exhaust. See United States v. Muhammad, 16 F.4th 126 (4th Cir. 2021); United States v. Hampton, No. 507CR00033, 2020 WL 4674112, at *1 (W.D.N.C. Aug. 12, 2020); United States v. Russo, No. 16-CR-441, 2020 WL 1862294, at *4-5 (S.D.N.Y. Apr. 14, 2020). This is the case here. As the Government does not raise an exhaustion challenge, it is considered waived.

4

Pertinent here, the First Step Act added a provision to § 3582(c)(1) that allows a defendant to bring a motion for compassionate release directly in a district court after either "the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Once the exhaustion requirement is met, a defendant must either (1) have "extraordinary and compelling reasons" for a compassionate release, or (2) be at least 70 years old, have served 30 years in prison, and have the Director of the BOP determine that the defendant is not a danger to the public. Id. Additionally, a court, in considering a reduction in sentence pursuant to § 3582(c)(1)(A), must consult the sentencing factors set forth in 18 U.S.C. § 3553(a) and may grant the reduction only if it is "consistent with [the] applicable policy statements" issued by the United States Sentencing Commission. Id. Of note is United States Sentencing Guideline § 1B1.13. Section 1B1.13 essentially reiterates the requirements of § 3582(c)(1)(A), with the additional requirement that a defendant not be "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2); see also Beck, 425 F. Supp. 3d at 578. The application notes to § 1B1.13 provide examples of extraordinary

5

and compelling reasons to grant a compassionate release, including when an inmate is suffering from a debilitating medical condition that has "substantially diminishe[d] the ability of the inmate to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13 application note 1(a)(ii). Specific to Isom's motion, the Fourth Circuit has held that Congress's recent amendments to the stacking provisions of 18 U.S.C. § 924(c) could constitute extraordinary and compelling reasons under § 3582(c)(1)(A)(i). United States v. McCoy, 981 F.3d 271, 285-86 (4th Cir. 2020).

For over three years, the Sentencing Commission has lacked a quorum and thus has not updated its policy statements on compassionate release since the First Step Act was signed into law in December 2018. McCoy, 981 F.3d at 282 n.6. Thus, the current phrasing of §1B1.13 addresses scenarios in which the BOP Director files a motion for compassionate release, but not situations in which an inmate files a similar motion under § 3582. As the language of § 1B1.13 limits its application to motions filed by the BOP Director, the Fourth Circuit has held that "§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Id. at 282. Accordingly, it has stated that "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and

6

compelling reasons' for a sentence reduction." Id. at 283. However, courts may consider § 1B1.13 as helpful guidance when considering a motion filed by an inmate. Id. at 282 n.7.[3]

## II. ANALYSIS

### A. Medical Conditions

In his initial motion for compassionate release, Isom argued that his declining health presented extraordinary and compelling circumstances warranting his release. (Doc. 195 at 3.) Specifically, Isom advised he was diagnosed with hypertension and hepatitis C. (Id.) His medical records confirmed these illnesses and revealed an additional diagnosis of stage 3 kidney disease. (Doc. 200 at 106-08.) Isom also claimed that "his left hand and arm may require amputation." (Doc. 195 at 3.) As noted above, upon the Government's objection, this court denied Isom's motion without prejudice, permitting him to refile his motion after exhausting his administrative remedies, which he has now done.

However, in his present motion, Isom makes no mention of his medical conditions as a basis for his compassionate release, focusing his arguments instead on his stacked convictions under 18 U.S.C. § 924(c). However, he did include his age and medical conditions in the administrative request he submitted to the

---

[3] The majority of circuits appear to follow this view that § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A), but this view has been rejected in at least one circuit. See United States v. Bryant, 996 F.3d 1243 (11th Cir. 2021).

warden. (Doc. 209 at 7.) In response, the Government has filed updated medical records (Doc. 211) and argues that Isom's health conditions do not constitute extraordinary and compelling circumstances. (Doc. 210 at 12.)

Based on a careful review of Isom's medical records, the court finds that Isom has not established that his medical conditions constitute extraordinary and compelling reasons for his release. To be sure, Isom has presented no evidence that his medical conditions are insufficiently managed by the BOP. His kidney disease is a chronic condition, but there is no evidence that he lacks "the ability . . . to provide self-care within the environment of a correctional facility" due to this condition. See U.S.S.G. § 1B1.13 application note 1(A)(ii). Nor has he provided any evidence that his illnesses are uncontrolled. To the contrary, his medical records suggest they are being effectively treated by the BOP. His hypertension is well managed by medication, as is his chronic kidney disease, and his hepatitis C is considered in remission. (Id. at 8-9, 19.)

Further, although he does not argue that the presence of COVID-19 warrants his compassionate release, Isom is fully vaccinated against COVID-19, including receiving one Moderna booster shot. (Id. at 68.) Recent research reiterates that this vaccine is safe and highly effective, preventing 93% of infections in clinical trials. See Effectiveness of Covid-19 Vaccines over

8

*a 9-Month Period in North Carolina*, 386 N. Engl. J. Med. 933 (Mar. 10, 2022). For the rare few individuals who are vaccinated but nevertheless contract COVID-19, the vaccine is also highly effective at preventing severe complications. CDC researchers have noted that vaccine effectiveness against hospitalizations for individuals who have received a third mRNA vaccine, like Isom, is 94%. *Effectiveness of a Third Dose of mRNA Vaccines Against Covid-19-Associated Emergency Department and Urgent Care Encounters and Hospitalizations Among Adults During Periods of Delta and Omicron Variant Predominance*, 71(4) Morbidity & Mortality Wkly. Rep. 139 (Jan. 28, 2022). In light of the vaccine's effectiveness, while considering Isom's chronic ailments, consistent with other courts that have considered the issue, this court finds that Isom's potential exposure to COVID-19 does not constitute an extraordinary and compelling reason for release. *See* *United States v. Brown*, No. 7:13-CR-44-FL-1, 2021 WL 2481676, at *2 (E.D.N.C. June 17, 2021) ("[T]he court agrees with the growing consensus of district courts that, in general, defendants who have received a highly effective COVID-19 vaccine cannot establish extraordinary and compelling reasons for release based on concerns about contracting COVID-19."); *United States v. Henderson*, No. 21-1653, 858 F. App'x 466, 468 (3d Cir. May 27, 2021) (affirming district court's denial of compassionate release where defendant had kidney disease, hypertension, and asthma); *United States v. Brown*, No.

9

1:17-cr-14, 2021 WL 1380276, at *3 (S.D. Ohio Apr. 12, 2021) (finding no extraordinary circumstances where defendant had chronic kidney disease, obesity, and prediabetes).

### B. Family Caretaker

In his request to the warden, Isom also listed his need to care for his mother who "suffered a severe stroke that led to paralisis [sic] on her entire right side of her body." (Doc. 209 at 7.) Isom's stated desire to care for his mother is understandable. All too often, it is the family members of a criminal defendant who suffer substantial collateral effects of the defendant's absence. Under the advisory guidelines, which are not binding on this court but which this court finds persuasive, the family caretaker ground for compassionate release does not extend to parents. The application notes to § 1B1.13 describe extraordinary and compelling reasons to grant a compassionate release due to family circumstances. See U.S.S.G. § 1B1.13 application note 1(C). These are limited to the "death or incapacitation of the caregiver of the defendant's minor child or minor children" or the "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." Id. Other courts that have considered the issue have denied compassionate release to defendants seeking to take care of elderly parents. See, e.g., United States v. Pepper, No. 21-3003, 851 F.

10

App'x 890, 891 (10th Cir. June 21, 2021) (holding "in any circumstance, caring for aging parents is not grounds for release."); United States v. Smith, No. 3:15CR101, 2021 WL 3641463, at *3 (E.D. Va. Aug. 17, 2021) (denying compassionate release after concluding defendant's desire to care for an ailing parent was not an extraordinary or compelling circumstance and there were others who could care for the parent); United States v. Finks, No. 14-0368-3, 2021 WL 5639543, at *3 (E.D. Pa. Nov. 29, 2021) (denying compassionate release as caring for one's "mother is not a familial circumstance that warrants compassionate release.").

Furthermore, to qualify for compassionate release under the family circumstances provision, the guidelines provide that a defendant must show "the death or incapacitation of the caregiver of the defendant's minor child or minor children." U.S.S.G. § 1B1.13 application note 1(C)(i). This provision is persuasive here. Even if the provision applied to parents, the "animating principle of the Family Circumstances category is that there exists an extraordinary and compelling reason for release when the defendant has a close family member who is completely unable to care for himself or herself and for whom the defendant would be the only available caregiver." See United States v. Lisi, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020), reconsideration denied, No. 15 CR. 457 (KPF), 2020 WL. 1331955 (S.D.N.Y. Mar. 23, 2020); Smith, 2021 WL 3641463 at *3. Isom has provided no evidence that he is

11

the only person available to care for his mother but rather has noted that she has "a bed nurse to feed her, bathe her, and clothe her each and every day." (Doc. 209 at 8.) Even given the severity of Isom's mother's condition, Isom has not shown that this is an extraordinary and compelling reason warranting his release.

### C.   Stacked 924(c) Convictions

The stated basis for Isom's current motion is his "stacked" 924(c) convictions. While Isom acknowledges that Congress "did not *per se* make the 924(c) stacking of weapons []retroactive[]," he argues he should nevertheless be granted compassionate release because it "is elementary in law, that once a substantive change in both the statutory language and punishment occur the law is deemed retroactive." (Doc. 209 at 3.) The Government responds by arguing that "Isom has not met the high standard of 'extraordinary and compelling reasons' even after McCoy." (Doc. 210 at 2.)

#### 1. Scope of McCoy

In McCoy, the Fourth Circuit affirmed the grant of compassionate release to four defendants who were serving § 924(c) sentences stacked in one indictment. McCoy, 981 F.3d at 277, 280. The court acknowledged that the First Step Act's change to § 924(c) sentencing was not retroactive, i.e., it did not apply to sentences imposed before December 21, 2018, when the First Step Act became law. Id. at 275; see United States v. Jordan, 952 F.3d 160 (4th Cir. 2020). However, the court noted that in addition to the

12

change in § 924(c) stacking, the First Step Act also amended § 3582(c)(1)(A) to "remove the Bureau of Prisons from its former role as a gatekeeper over compassionate release petitions" and to permit defendants to file motions for compassionate release directly in a district court on their own behalf. Id. at 276.

The Fourth Circuit concluded that a district court does not abuse its discretion when it determines, after an "individualized assessment[]" of a particular defendant, that the "sheer and unusual length" of a stacked § 924(c) sentence combined with the "gross disparity" between that sentence and the sentence a defendant would receive today can constitute an "extraordinary and compelling" reason for relief under § 3582(c)(1)(A). Id. at 285-86.[4] The Fourth Circuit cited the following facts as relevant to the requisite "individualized assessment" in the consolidated cases before it: the defendants ranged from 19 to 24 years old when they committed their offenses; they had either no prior criminal history or at most a single minor conviction; they received total sentences ranging from 35 to 53 years based largely

---

[4] But see United States v. Crandall, 25 F.4th 582, 586 (8th Cir. 2022) (holding that the district court cannot consider 924(c) change in law and stating that the "compassionate release statute is not a freewheeling opportunity for resentencing based on prospective changes in sentencing policy or philosophy"); United States v. Thacker, 4 F.4th 569 (7th Cir. 2021) (holding that the change in 924(c) statute cannot constitute a basis for finding "extraordinary and compelling reasons" but may be considered as to sentence length once an extraordinary and compelling reason is found to warrant a reduction); United States v. Andrews, 12 F.4th 255 (3rd Cir. 2021) (same).

on their stacked § 924(c) convictions; they had served between 17 and 25 years of their sentences at the time they filed for compassionate release; they would have served either the entirety or almost the entirety of their sentences had they been sentenced under the revised § 924(c) scheme; and they had demonstrated extensive rehabilitation while incarcerated. Id. at 277-79, 286.

To be sure, McCoy does not hold that the First Step Act's change in § 924(c) sentencing is, *per se*, an extraordinary and compelling reason. According to the court, it lies within the district court's discretion to consider that change in law, among other factors, in analyzing whether extraordinary and compelling reasons exist, not that the court must do so. For example, it is not "improper" for the district court "to consider the First Step Act's declaration of the appropriate level of punishment under § 924(c) in assessing the defendants' cases, on an individualized basis, for compassionate release." Id. at 275. District courts are "empowered" to consider "any extraordinary and compelling reason for release that a defendant might raise." Id. at 284 (citation omitted). The Fourth Circuit found that the district courts in McCoy "appropriately exercised the discretion" conferred by Congress. Id. at 288. They "took seriously the requirement that they conduct individualized inquiries, basing relief not only on the First Step Act's change to sentencing law under § 924(c) but also on such factors as the defendants' relative youth at the

14

time of their offenses, their post-sentencing conduct and rehabilitation, and the very substantial terms of imprisonment they already served." Id. (emphasis added).

With this understanding of McCoy, the court turns to the present motion.

### 2. Isom's Motion

The Government argues that after conducting the "individualized inquiry" from McCoy, Isom's motion for compassionate release should be denied in light of the "defendant-specific factors of this case, including the offense conduct, Isom's role, and his history." (Doc. 210 at 10.) Isom does not address any of the individualized factors from McCoy in his motion.

Isom's underlying crimes were not only dangerous, they were traumatic to all involved. Beyond brandishing a firearm, Isom proceeded to point the handgun at the tellers in each of his bank robberies. According to the victim impact statements, at least one victim "does not trust people like she once did and is afraid at night," and "felt helpless for a long time." (Doc. 137 at ¶ 12.) Unlike the defendants in McCoy who ranged from 19 to 24 years old when they committed their offenses, Isom was 46 when he committed the underlying bank robberies. (Doc. 137 at ¶¶ 60-62.) The McCoy defendants had either no prior criminal history or, at most, had a single minor conviction. McCoy, 981 F.3d at 277-79. In starker contrast here, Isom had multiple offenses at the time

15

of the bank robberies. These offenses include felonious armed robbery at the age of 18, felonious escape and aggravated assault at 24, felonious strong-armed robbery at 27, felonious robbery with a dangerous weapon at 33, and felonious threatening of life, person, or family of a public official also at 33. (Doc. 137 at ¶¶ 48-50, 53-54.) Not only are these prior offenses serious, but they were also committed well beyond an age of adolescence, and some of the events in Isom's criminal history mirror his underlying convictions here -- armed bank robbery.

The Fourth Circuit also considered the sentences the McCoy defendants received which ranged from 35 to 53 years and were largely based on their stacked § 924(c) convictions. McCoy 981 F.3d at 277-79. In total, Isom was sentenced to 659 months, or roughly 55 years. (Doc. 210-1 at 3.) Isom received 275 months for his robberies, 84 months for the § 924(c) count in 03-CR-241-1, and 300 months for the § 924(c) count in 03-CR-242-1. (Doc. 68, 03-CR-242-1 Doc. 65.) Were he to be resentenced under the current Sentencing Guidelines, the same range of 262 to 327 months would apply to his armed bank robbery convictions, and he would still face both a mandatory 84-month consecutive sentence for his first § 924(c) conviction and a mandatory 84-month consecutive sentence for his second § 924(c) conviction.[5] With his sentence

---

[5] In his reply, Isom argues this calculation is incorrect, because under today's guidelines "there would not exist a second or subsequent 924(c),

of 275 months on the robberies, Isom would still be subject to two consecutive 84-month sentences, for a total of 443 months of imprisonment. In other words, 216 months (33 percent) of his 659-month sentence are attributable to § 924(c) stacking.

So, in several important respects, Isom differs from the McCoy defendants. First, and most obviously, Isom was a career criminal at age 46 when he committed the instant offenses, whereas McCoy was only 19 years old and his only prior conviction was for reckless driving resulting in only a fine. Second, Isom used firearms and dangerous weapons in several prior offenses for which he was convicted. Third, two separate 25-year sentences imposed at different times were insufficient to deter Isom before these offenses of conviction. Fourth, the impact of stacking on the McCoy defendants was a much larger percentage of the overall sentence.[6] Fifth, in McCoy the defendants would have served either the entirety or almost the entirety of their sentence had they

_____

because the first 924(c) has not become final." (Doc. 208 at 2.) This is wrong. Violations of § 924(c) carry a minimum sentence which "rises to 7 years if the defendant brandishes the firearm." United States v. Davis, 139 S. Ct. 2319, 2324 (2019). Repeat violations carry a minimum sentence of 25 years only after a prior § 924(c) conviction becomes final. Id. at 2324 n.1. If Isom were sentenced under the current guidelines, his first § 924(c) conviction would not be final so as to subject his second violation of § 924(c) to a mandatory minimum of 25 years. However, his second § 924(c) charge, whether final or not, is still punishable by a mandatory minimum sentence for brandishing a firearm, which is 7 years (i.e., 84 months).

[6] McCoy himself faced only 37 months of imprisonment for his underlying robberies, whereas Isom faced between 262 to 327 months. McCoy, 981 F.3d at 277.

Case 1:03-cr-00241-TDS   Document 213   Filed 04/12/22   Page 17 of 23

been sentenced under the current § 924(c) scheme. McCoy 981 F.3d at 279, 286. However, even if Isom were sentenced under the modern § 924(c) scheme, he has served 18 years, which would only be roughly just over half of his sentence (assuming he received good conduct credit) even if the 25-year stacked second sentence were removed. (Doc. 210-1 at 3.)

The final factor considered in McCoy was whether the defendants had demonstrated extensive rehabilitation while incarcerated. McCoy, 981 F.3d at 286. Here, Isom has taken steps toward rehabilitation. Since his incarceration in 2003, he has completed more than 543 hours of educational and vocational courses. (Doc. 201-2.) However, these positive steps are counterbalanced by several infractions which demonstrate a failure to abstain from criminal conduct. The infractions include refusing to return to his cell during an emergency in 2005, attempting to bribe a staff member in 2010, indecent exposure in 2012, theft in 2016, continued possession of hazardous tools in 2018, attempting to introduce narcotics and a cell phone SIM card in 2018, verbally threatening bodily harm to staff in 2018, and, most recently, threatening bodily harm in 2020. (Doc. 210-3.) And although restitution was not an explicit factor in McCoy, it is noteworthy that Isom has failed to make any real progress in paying his restitution -- paying only $62.18 of the $48,596 imposed. (Doc. 210-4.) Based on the complete record, including Isom's medical

18

condition, his age at the time of the crimes, his extensive prior criminal history, the seriousness of the offenses, the proportion of his sentence based on his stacked § 924(c) convictions, and the fact that even under the revised § 924(c) scheme Isom has served only half of his sentence, Isom's motion for compassionate release based on his stacked charges is denied as his stacked sentence, in combination with all other factors, is not an extraordinary and compelling circumstance warranting release.

Even assuming his medical conditions, desire to care for his mother, and stacked 924(c) convictions constituted extraordinary and compelling circumstances, the § 3553 factors advise against Isom's release. Section 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). The court must consider —

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care,

19

> or other correctional treatment in the most
> effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence[s] and the sentencing range
> established for [the applicable offense category as set
> forth in the guidelines] . . .;
>
> (5) any pertinent policy statement . . . by the
> Sentencing Commission . . .;
>
> (6) the need to avoid unwarranted sentence disparities
> among defendants with similar records who have been
> found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of
> the offense.

Id. As detailed below, these factors weigh against Isom's release.

In complete disregard for human life, Isom walked into a bank, armed with a handgun, and proceeded to brandish his firearm and point it at numerous bank tellers. (Doc. 137 at ¶¶ 4-10.) Then he did it again, apart from being suspected of participating in other armed bank robberies. (Id. at ¶¶ 4, 8, 60.) While the court recognizes Isom's steps toward rehabilitation, he continued to participate in dangerous and forbidden activities while serving his sentence, including possessing hazardous tools, attempting to introduce narcotics into the prison, and threatening staff members on several occasions. (Doc. 210-3.)

Isom's criminal history reflects a persistent engagement in violent and dangerous criminal activities that was undeterred by lengthy sentences. In 1975 at age 18, he committed a string of

20

robberies and break-ins that subjected him to a 25-year sentence in one case and a concurrent 7-year sentence in another. (Doc. 137 at ¶¶ 45-48.) He was paroled in 1983, and within a year he committed three more robberies and was imprisoned in 1984 until May 1990. (Id. at 50-52.) In two of those robberies, he was armed with a weapon at age 27 (id. at ¶ 50), in the other he beat the store owner in the head (id. at ¶ 52). By August 1990 at age 33, he committed another armed robbery with a pistol. (Id. at 53.) That armed robbery was significant for its violence: Isom threatened that upon his release he would kill two detectives and their families, rape and kill a female parole officer, and kill the parole officer's family. (Id. at ¶ 54.) He received yet another 25-year sentence for the robbery and a consecutive 5-year sentence for the felony threats. (Id.)

Isom was released from prison on August 17, 2001. By March of 2002, at the age of 45, he was wanted in connection with the armed robbery of the Wachovia Bank in Columbia, South Carolina. (Id. at ¶ 65.) He committed the instant offenses a month later. Before his apprehension by federal authorities, he was wanted for the armed robbery of a Sprint store and assaulted two local law enforcement officers attempting to arrest him. (Id. at ¶¶ 60-61). As the Government properly characterizes it, in short Isom has lived a life of violent, assaultive crime that has left a trail of victims across the Carolinas since 1975. His 55-year sentence, as

large as it is, is put in perspective in light of the fact that the prospect of 50 years of incarceration was not sufficient to deter Isom.

Even were the court to resentence Isom under the current § 924(c) penalties, he would only be roughly halfway through serving his sentence. Under these circumstances, early release from his sentence would provide inadequate deterrence, insufficiently reflect the seriousness of Isom's underlying offenses, fail to adequately protect the community, and fail to fully recognize Isom's criminal history and continued refusal to respect the law. As such, even had his medical conditions, desire to care for his mother, and stacked charges presented extraordinary and compelling circumstances, the § 3553(a) factors advise against his release at this time.

To the extent Isom asks for his sentence to be reduced to something less than his current sentence, but more than time served, the court will deny the motion without prejudice. Rather than decide now whether a sentence reduction is appropriate, the court concludes it is better to deny the motion without prejudice to a renewed motion at a later point in time, when Isom has served a more substantial portion of his sentence, or if his health conditions become more severe, or he has some other basis for release. See United States v. Hancock, No. 06-CR-206-2, 2021 WL 848708, at *4-6 (M.D.N.C. Mar. 5, 2021), aff'd, No. 21-7393 (4th

Cir. Mar. 1, 2022) (denying compassionate release motion to reduce defendant's § 924(c) stacked sentences without prejudice).

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Isom's motion for compassionate release (Doc. 209; Doc. 205 in case number 1:03-CR-242-1) is DENIED WITHOUT PREJUDICE.

                                        /s/    Thomas D. Schroeder
                                    United States District Judge

April 12, 2022

23